UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
HANDSOME, INC., et al.        :
                              :
     Plaintiffs,              :
                              :
v.                            :     Case No. 3:11-CV-1288(RNC)
                              :
TOWN OF MONROE, et al.,       :
                              :
     Defendants.              :
```

<u>RULING AND ORDER</u>

Handsome, Inc. ("Handsome") and its officers, Todd and Mona Cascella, bring this action under 42 U.S.C. § 1983 against the Town of Monroe (the "Town"), the Planning and Zoning Commission of the Town (the "Commission"), and former Town officials, seeking damages allegedly caused by the Commission's handling of Handsome's request for an extension of a special permit.  The third amended complaint claims that the defendants have (1) deprived plaintiffs of property in violation of the Due Process Clause of the Fourteenth Amendment, (2) retaliated against them for appealing a decision of the Commission in violation of the right to petition guaranteed by the First Amendment, and (3) treated them less favorably than a similarly situated third party with no rational basis for doing so, in violation of the Equal Protection Clause of the Fourteenth Amendment.

1

Defendants have moved for summary judgment on all the claims. They contend that Handsome was not deprived of a constitutionally protected property interest; the retaliatory activity alleged in the complaint cannot provide a basis for relief; and Handsome was not similarly situated to its comparator.  They further contend that the individual defendants are entitled to qualified immunity as a matter of law.  I agree with these contentions and therefore grant the motion.

## I.   Factual Background

The following facts are drawn from the parties' Local Rule 56(A)(1) and (2) Statements, evidence in the summary judgment record viewed most favorably to plaintiffs, and public records subject to judicial notice.

Plaintiffs Todd and Mona Cascella are residents of Easton, Connecticut.  During the relevant time, they owned and operated Handsome and non-party Cascella & Son Construction, Inc. ("Cascella & Son"), both Connecticut corporations.  Mr. Cascella was President of both entities; Ms. Cascella was Secretary of Handsome and Vice-President of Cascella & Son.

The Town of Monroe is located in eastern Fairfield County.[1]

---

1 The Town has a total area of approximately 26 square miles.  As of the 2020 United States Census, it had a population of 18,825, down slightly from the census of 2000, when it had 19,247 residents.  The legislative power of the Town is vested in the Town Council, which consists of nine members elected at

The Planning and Zoning Commission consists of five members elected to four-year terms and three alternates. It has the powers and duties conferred on planning and zoning commissions under Chapter 124 of the Connecticut General Statutes, §§ 8-1 to 8-13a. The main functions of the Commission are to enact and amend zoning regulations and act upon applications for zoning permits, including special permits.[2] Connecticut law vests the Commission with discretion to impose conditions on special permits to protect public health, safety, convenience and property values. See International Investors, 344 Conn. 46, 60-61 (2022); Oakbridge/Rogers Ave. Realty, LLC v. Planning & Zoning Board of Milford, 78 Conn. App. 242, 245-47 (2003).

In 2001, Handsome acquired title to a ten-acre parcel of land located at 125 Garder Road in Monroe by means of a quitclaim deed from Mr. Cascella. Under zoning regulations in effect at the time, the land was in Design Industrial District Number 2, an industrial use zone. See Town of Monroe Zoning

_____

large for terms of two years. The executive power is vested in the First Selectman, who is also elected for a two-year term.

2 Conn. Gen. Stat. § 8-2 provides that a local zoning commission may adopt a "special permit or special exception" procedure. The terms "special permit" and "special exception" are synonymous. A special permit authorizes the applicant to use a parcel of property in a manner that is compatible with uses permitted as of right in the zoning district but requires the applicant to comply with conditions not applicable to other uses in the district. See Beckish v. Planning & Zoning Com'n of Columbia, 162 Conn. 11, 14 (1971); Terry J. Tondro, Connecticut Land Use Regulation 175 (2d. ed. Cum. Supp. 2000) (hereinafter "Tondro Treatise").

Regulations, §§ 117-100 (July 26, 2012).  All uses within this zone required a special exception permit approved by the Commission.  See id., § 117-1200(a).

In February 2003, Handsome filed an application for a special permit allowing it to construct a 20,000 square foot industrial building at 125 Garder Road.  Handsome stated that it was interested in constructing a total of three industrial buildings at the site, but was seeking permission to construct only the first building in order to avoid permitting delays, get the project going and produce a source of income.  Because of the characteristics of the site, excavation and grading would be necessary to prepare the site for the building.

At a hearing on March 20, 2003, the Commission voted unanimously to grant Handsome the requested permit for a period of five years.[3]  Thirty-six special conditions were imposed, including the following:

> Handsome had to provide a progress report from a supervising design engineer every sixty days until the completion of all grading activities at the site, detailing the status of excavation, contour levels, amount of materials removed, and any conditions requiring mitigation or other correction action;
>
> no topsoil could be removed from the site until

---

[3] In attendance were Commission members Andrew Abate (Chair), W. Mark Michaels, Joseph Ziehl, Charles Moore (Alternate for Robert Martin), Donald Pavia (Alternate for Susan Scholler) and Deborah Pothier.

> completion or stabilization of all areas of disturbance;
>
> prior to commencement of activity at the site, Handsome had to post a bond, in an amount to be determined by the Commission, "for the purpose of securing completion of the site work or restoration or stabilization of the disturbed site"; and
>
> construction of the building had to commence by March 20, 2004, and be completed by March 20, 2005.

See ECF No. 126-2.

On July 1, 2003, the Zoning Board of Appeals of the Town of Monroe granted a waiver of Section 117-2109P to Mr. Cascella, who had requested permission "for temporary use of rock processing equipment for the purpose of site preparation."  ECF No. 119-1 at 46.  The approval was for one year and subject to the following conditions: the submission of the landscaping and berm plan; no rockwork on Saturdays; operating hours of 8:00 AM to 4:00 PM on Monday through Friday; and no processing of off-site material on site.

Handsome leased the property at 125 Garder Road to Cascella & Son, which proceeded to excavate and process large quantities of rock and other earth materials for sale to various construction companies.  From 2004 through 2007, Cascella & Son supplied stone products to contractors working on public road construction projects in Fairfield County.  These sales, which totaled between $400,000 and $600,000, provided the Cascellas

with their main source of income.

In April 2008, one month before the permit was due to expire, David S. Bjorklund, Jr., an engineer retained by Handsome, submitted correspondence to the Commission requesting a five-year extension of the permit.  As of that time, excavation necessary to prepare the site for the approved building was only partially completed.  Years later, Mr. Cascella testified that Handsome could not begin to construct the approved building until the site was excavated for all three potential buildings; otherwise, the first building could be damaged as a result of blasting that would be necessary to prepare the site for the other buildings.

Handsome's request for an extension was taken up by the Commission at a hearing on April 24, 2008.  Present for the Commission were Charles Moore (Chair), Joel Leneker, Richard Zini, Deborah Helm (Alternate for Michael Manjos) and Mark Antinozzi (Alternate for Michael Parsell).  Mr. Cascella attended the meeting along with Mr. Bjorklund.

At the outset of the hearing, Daniel Tuba, the Town Planner, provided the Commission members with a packet of written materials.  An extended discussion then took place among Mr. Tuba and members of the Commission concerning: (1) the lack

of progress at the site; (2) whether the special permit authorized the excavation-related activities; (3) Handsome's failure to file progress reports; and (4) frustration on the part of the Chair and other members of the Commission regarding laxity in the enforcement of zoning regulations by Town officials, especially with regard to excavations.[4]

The meeting minutes, prepared from an audio tape recording of the hearing, document the following discussion concerning the lack of progress at the site:

> (CHAIRMAN MOORE) I was on the Commission at the time
> that this application was presented and approved.  And
> I watched the development from time to time over the
> years and in my view this operation is nothing but a
> mining operation.  They have a sign up there that
> all[] the[y're] doing is selling processed stone, rock
> crushers on the site.  And my view . . . is that the
> construction of the industrial building on this site
> is secondary to the operation that's going on there.
> * * *  I would be hard-pressed to call this site half-
> way completed.  I don't know what the grade plan is,
> but apparently, it's a long way from that.
>
> ***
>
> (COMMISSIONER LENEKER) I drove by the site and I was
> not on the Board at the time the permit was granted .
> . . .  I can see where you have to give builders time
> for unforeseen economic issues, being able to build a

---

4 Excavation operations were separately regulated under Article XXI of Monroe's zoning regulations, which prohibited excavation of rock without an excavation permit except in certain circumstances.  See Town of Monroe Zoning Regulations, § 117-2100.  The regulations authorized the issuance of excavation permits subject to numerous conditions.  See Renz v. Planning & Zoning Com'n of Monroe, No. CV 28 47 88, 1992 WL 369634 (Conn. Super. Ct. Nov. 17, 1992) (upholding most of seventy-eight conditions imposed on excavation permit).

building and have a tenant or sell the building,
whatever. But we also have to create a balance with
the neighborhood and the community . . . . [H]ow can
we be assured that this project's ever going to get
completed and that we're not just going to keep
digging rock, digging rock, digging rock forever, and
ever and ever, there.

\*\*\*

Just one more point.  The project narrative does say
that the building will be one of 3 potential buildings
. . . .  The first paragraph says that they are
looking to put up one building that does not require
[a] parking lot . . . onsite sewage disposal or [a]
well.  It would be one of 3 potential buildings.  In
order to get the project moving and produce income we
have shown a building that would not need Zoning Board
of Appeal waivers or Inland Wetlands approvals.  So
obviously when this was presented, they wanted to go
forward with a project that would get this building
built and now we're looking for an extension 5 years
later.  Somebody says we're halfway through.  Maybe
we're halfway through.  I do not know.

\*\*\*

(COMMISSIONER HEIM)  . . . What's the percentage of
completion on the original project?  Do we know that?

(CHAIRMAN MOORE)  I personally have watched this site
from time to time because I travel Garder Road.  In my
view, I don't know what the final grade is, but only
about 25% if I were to venture an estimate.

(COMMISSIONER HEIM)  So 5 years and 25%.

(CHAIRMAN MOORE)  It looks far from being complete to
being a buildable site.

ECF No. 170-11 at 2-5.

With regard to the excavation-related activities at the

site, the minutes document the following discussion:

> (COMMISSIONER ZINI)  * * * There's currently a sign
> [at the site] . . . advertising the sale of rock
> materials and processed stone, which my understanding,
> the approval did not want any of that activity.  The
> approval also talked about no storage on site . . . ,
> maintaining control of the erosion requirements for
> the site, none of which are happening.  There's stored
> truck parts on the site. There's a storage container
> on the site.  There is excavation equipment.  There's
> mining equipment and processing on the site. When I
> read the application approval I didn't see any of
> those things as part of the approval.
>
> ***
>
> (MR. TUBA)  I'm puzzled by what you're saying that no
> material [is] supposed to be sold off or removed from
> the site.  I'm looking at that line of the permit.
> I'm not finding that anywhere.
>
> (COMMISSIONER ZINI)  Where does it allow excavation
> and sale of site material?
>
> (MR. TUBA)  There's an approved site plan with a
> grading plan.  That material's got to go some place.
>
> (COMMISSIONER ZINI)  A percentage of the material has
> to go some place to develop a foot print for the
> building.  So, how do we know what [that] percentage .
> . . is? We don't.  And we don't have the reports to
> substantiate it either.  If you could put a report in
> front of me telling me how much is being excavated . .
> . and show me by reports what's been approved and
> removed from the site, that's one thing. But if you go
> out there and look at the site, you have no idea what
> that percentage is or where it's coming from.  So, I
> don't buy that position at all.

Id. at 4-6.

    Handsome's failure to file progress reports was discussed

as follows:

> (COMMISSIONER LENEKER) . . . Again, in the SEP, item #5 says Permittee shall every 60 days, or within such sooner period as may be required, provide to the Planning and Zoning Department a progress report prepared by the Supervising Design Engineer until the conclusion of all grading activity.  That print shall detail the extent of excavation, contour levels, amount of earth materials removed, and any conditions which may have been encountered, which have required or may require mitigation or corrective action.  Has that been happening every 60 days?  Do we have those reports on file?

> (MR. TUBA)  We've gotten them intermittently.  We try to chase them down periodically.

> (COMMISSIONER ZINI)  So why are we not stopping work there if we're not in compliance?

> (MR. TUBA)  Whenever we . . . . approached them and said, look we're going to stop [you], we've got whatever material needed.

> (CHAIRMAN MOORE)  Well, over 5 years, then we should have something like
> . . .

> (COMMISSIONER ZINI)  Five inches of reports.

> (CHAIRMAN MOORE)  How many reports do they actually have on file?

> (MR. TUBA)  Uh, 3 or 4.

> (CHAIRMAN MOORE)  Out of a potential 30?

> (COMMISSIONER ZINI)  Five years to get 4 reports?  And the job's never been warned of pulling the application and using a cease and desist?

> (MR. TUBA)  Yes.

(COMMISSIONER ZINI)  So there is a cease and desist warning?

(MR. TUBA)  No.  Well, there have been.  They have.  I cannot give you a specific answer in terms of what's been said and when.  I know there have been instances of discussion to get us the material, reply to us, it is done, job lags, job shut down.

Id. at 5-6.

Finally, with regard to laxity in the enforcement of zoning

regulations, the minutes show the following:

(COMMISSIONER ZINI)  It just seems to me that we're playing cat and mouse and you know what?  You can see why the residents in the town including some of us on this commission, are upset about the excavation issues in Monroe.  There is no enforcement.  You get an approval, and then you do whatever the hell you want on the site, and that is not the purpose of land use regulations.  Land use regulations are here for a reason and it's the Commission's job to make sure they're followed.  You know, rubber stamping an application is not what this Commission's job is.  That's exactly what this process appears to me.  You know, we ask for certain things. You're asking us to review an extension now, when we can't even quantify [what] the first approval was met with.  We have no reports. You can't substantiate what's been removed. You know, I'm a little confused why we'd even entertain it at this point, then.  I think it's a, I don't, I'm being difficult.  I don't want to appear being difficult Dan, but I'm asking frank questions that nobody can answer.

(MR. TUBA)  The request was made.  I put the request out here for you. That's all.

(COMMISSIONER ZINI)  I agree.  I think we need to be a little more efficient in how we're presenting these packets, because I as a commissioner want to know what's on the file and when a letter like this comes

in front of me, frankly I don't want to do all the
homework on it.  I want to know what's on file for 5
years, before I even think about what I'm going to do
with an application like this, or request to extend. I
think it's only fair.

(CHAIRMAN MOORE)  I agree.

(COMMISSIONER LENEKER)  Somebody went through great
lengths.  The Board went through great lengths to hear
the application.  Probably there were some concessions
on both sides made, I wasn't on the Commission, but I
do have you know, in the file this Special Exception
Permit that outlines all of these conditions and if we
spend this much time on this Board, spend this much
time to put these conditions on there, then, I think
the Board expects them to be followed and
substantiated. And if we're not doing it, then this
Commission is not doing their job, and our Zoning
Enforcement Officer's not doing his job, our
Selectman's [not] doing his job, our Planning
Commission is not doing their job.  * * * You know, I
would ask the person that is making this request, if
they had this information that we have, what would
they say?  But to make this positive, I would hope
that we could find some way to expedite this going
forward . . . and have some assurance that this
project is going to be completed in a timely fashion
as per the approval.

Id. at 6.

In the same vein, Commission member Zini commented:

[M]y issue is that you know, if, if we have site
applications we approve, my position on this
Commission is that these applications are to be
adhered to.  They are not a gray area.  They are not
to be manipulated.  Granted we were, not necessarily
all of us were on the Commission at the time.  But
moving forward, the purpose of having these reviews
and approvals and hearings is to have a set process
and we expect the applicants and developers to stick
to that process.  If not it's a [moot] point.  And

frankly the conditions I've seen on the record and
what I see now say that this has not complied [with]
in 5 years.  Now, there's been a number of issues,
there's been complaints by residents to Town Hall
about activity hours, times of activity, when activity
is there, how it impacts the neighborhood.  You know,
these are all issues we talk about. We you know, sit
up here and make these rulings on these applications
that we're supposed to, but I'm a little confused that
we keep running around in circles on this discussion
that well, we approve it, but there's not much that we
can do about it.  We certainly can do something about
it.  That's why we're sitting here. It's our job to
enforce these, these regulations and if, if it's an
issue . . . that the ZEO office isn't strict enough
with these issues, or the Commission needs to be more
aware of checking sites under construction, and asking
the ZEO to do it, then so be it.  But, I mean, to
blanketly tell me that there's not any issues with the
site, I don't agree with that at all.  There's been
issues with this site. And frankly I'd like to know
why there's a sign advertising processed rock or
gravel from the site, when it's specifically
prohibited on the site now.  So, that's my input here.

Id. at 5.

After further discussion, the Commission voted unanimously

to deny the requested extension, leaving it to Handsome to apply

for a new permit.[5]  Instead of submitting a new application to

the Commission, Handsome appealed the denial to the Superior

Court.[6]

---

5 Condition 32 of Handsome's permit provided: "Should any changes in site
plan or conditions of approval be contemplated, they shall be submitted to
the Commission for review.  Should any changes be considered as major or
substantial changes, or beyond the scope of the referenced plans, they shall
be applied for under a special exception permit application to modify the
approved site plan."  ECF No. 93-4 at 6.
6 Conn. Gen. Stat. § 8-8(a) authorizes administrative appeals from decisions
of zoning commissions, which are classified as administrative agencies.  See

Several months before the hearing on the extension, Handsome had submitted a proposal to build a 32-unit affordable housing complex on a different property on Garder Road.  The Commission held its first public hearing on the affordable housing application on April 10, 2008, two weeks before the hearing on the request for the 125 Garder Road permit extension. The Commission subsequently held several hearings on the affordable housing application.  On August 7, 2008, the Commission voted unanimously to deny the application and Handsome appealed.  In July 2009, while the appeal was pending, the dispute was resolved by means of a settlement agreement enabling Handsome to build a 28-unit project.

While Handsome's appeal from the denial of the permit extension was pending, Handsome lost ownership of the property at 125 Garder Road as a result of an action brought in state court to foreclose a mechanic's lien against the property.  On December 29, 2008, a judgment of strict foreclosure entered in favor of the lienor, MD Drilling & Blasting, Inc. ("MD Drilling").  An agreement was subsequently reached between MD Drilling and Mr. Cascella, acting on behalf of Handsome and Cascella & Son.  MD Drilling promised to take no action on the

---

Tondro Treatise at 589.

judgment in exchange for installment payments by Handsome.  For reasons not shown by the record, no motion to reopen the judgment was filed and the law day was allowed to pass without redemption.  As a result, title to the property vested in MD Drilling effective June 10, 2010, and Handsome's ownership interest in the property was extinguished.[7]

Three months later, on September 10, 2010, the Superior Court sustained Handsome's appeal from the denial of the permit extension. See Handsome, Inc. v. Monroe Planning & Zoning Comm'n, No. CV084025399, 2010 WL 4069761, at *1 (Conn. Super. Ct. Sept. 10, 2010). The court stated: "[i]n deciding whether to renew a special exception permit essentially the same as that which the commission had previously approved, the commission's discretion was limited to considering whether any facts and circumstances had materially changed so as to affect the reason for the original decision."  Id. at *5 (citing Haines v. Zoning Board of Appeals, 26 Conn. App. 187, 191-92 (1991)). Continuing, the court stated: "because the plaintiffs' current request seeks the same relief as their earlier application, and because the record does not reflect any intervening changed

---

7 Condition 33 of Handsome's permit required it to notify the Commission "of any change in the status of ownership . . . ."  ECF No. 93-4 at 6.  However, no such notice was provided.

conditions or other considerations materially affecting the matter decided, the commission had no option but to approve the plaintiffs' request for an extension." Id. at *6.  No reference was made to the change in ownership of the property, presumably because the court was unaware of it.  The Commission did not seek to appeal, so the decision became final on September 30, 2010, when the appeal period expired.

On October 1, 2010, Handsome's counsel at the time, Anthony Ranelli, submitted a letter to the Commission calling on it to issue the five-year permit extension and stating that "no new conditions should attach [to the permit]."[8]  On November 2, 2010, he submitted another letter.  The letter noted that more than fifty days had passed since the court's order and requested that the matter be placed on the Commission's next agenda.  Soon after the letter was submitted, the Town commenced a tax foreclosure proceeding against the property.[9]  The foreclosure proceeding arose from Handsome's failure to pay taxes on 125 Garder Road and other property in the Town.  A tax auction was

---

8 The letters were addressed to "Chairman Zini and Commission Members."  See ECF Nos. 105-7, 105-8.
9 Deposition testimony (ECF No. 105-9 at 12) shows that the tax foreclosure proceeding started in "late 2010"; according to the briefing, it started "around th[e] time" of November 2010.  ECF No. 105 at 15.

scheduled for April 7, 2011.  Plaintiffs' mortgage lender paid the tax arrearage and the auction was cancelled.

Following the resolution of the tax foreclosure proceeding, Mr. Schatzlein and other defendants made an unannounced visit to 125 Garder Road, where they encountered Mr. Cascella.  First Selectman Vavrek informed him that complaints about blasting at the site were being made by area residents, including Karen Martin, an alternate on the Commission, who lived across the street from 125 Garder Road.  Mr. Cascella responded that there had been no blasting at the site for approximately one year. Mr. Schatzlein falsely accused Mr. Cascella of working at the site in violation of a cease-and-desist order.  Mr. Tuba had issued such an order but the order had been withdrawn.  Mr. Schatzlein threatened to require Mr. Cascella to post a $100,000 restoration bond as part of the permit extension and asked him if he could afford such a bond.

After the site visit, Mr. Schatzlein, in his capacity as "acting clerk of the Commission," drafted a letter addressed to "Handsome, Inc. Attn: Todd Cascella," regarding "Handsome, Inc., et al. v. Monroe Planning and Zoning Commission, et al., Docket Number FBT CV 08 4025399S."  ECF No. 170-30.  The draft contemplated that Handsome's request for a five-year extension

would be granted on terms requiring it to complete the project within two years.  This would be accomplished by calculating the start date of the extension's five-year term based on the expiration date of the original five-year term, leaving Handsome with just two years to complete the project.  In addition, Handsome would have to comply with all the original conditions of approval, some of which would have to be addressed within 30 days.  Finally, the draft contemplated that Handsome would have to post a $100,000 restoration bond before resuming work at the site.

The next day, May 5, 2011, the Commission addressed Handsome's request for an extension at a regular meeting.  It is apparent that the Commission did not realize Handsome no longer owned the property.

The agenda provided in pertinent part:

3. RECESS REGULAR MEETING and CONVENE to EXECUTIVE
SESSION.  Review of enforcement procedures with Town
Engineer/Acting Clerk of the Commission, First
Selectman, Land Use Attorney and Zoning Enforcement
Officer.
4. RECONVENE REGULAR MEETING
5. OTHER BUSINESS
6. ENFORCEMENT. 125 Garder Road – activity without
permits . . .
22. LEGAL ISSUES . . . 125 Garder Road – compliance
with extension of approval.

ECF No. 93-12 at 1-2.

18

At the outset of the meeting, the Commission convened in executive session.  In attendance were Richard Zini (Chairman), Patrick O'Hara (Vice Chairman), Joel Leneker (Secretary), William Porter (Regular Member), and Michael Parsell (Regular Member).  Ms. Martin also attended the executive session although she was recused from matters involving Handsome's project at 125 Garder Road.[10]  In addition, the executive session was attended by First Selectman Vavrek, Town Engineer Schatzlein, Zoning Enforcement Officer ("ZEO") Joseph Chapman and Attorney Edward P. McCreery, III, a partner in the law firm of Pullman and Comley, LLC, who had been retained to provide legal counsel to the Town with regard to the permit extension.[11]  The executive session lasted approximately fifty minutes.

When the public meeting resumed, Commissioner O'Hara moved that the Commission: (1) extend the permit until March 2013, five years from the expiration date of the original permit but just two years from the date of the meeting; (2) require Handsome to post a restoration bond, as contemplated by the original approval, before resuming work at the site; and (3)

---

10 Conn. Gen. Stat. § 8-11 provides, "No member of any zoning commission . . . shall participate in the hearing or decision of the . . . commission of which he is a member upon any matter in which he is directly or indirectly interested in a personal or financial sense."
11 Mr. Tuba had retired as town planner on February 1, 2011.

require Handsome to comply with all the other conditions of the
original permit.  The motion was approved unanimously.

Commissioner O'Hara then moved that the Commission: (1)
require Handsome to post a restoration bond as recommended by
the Town Engineer; and (2) require Handsome to provide the
following: (a) the progress reports required by the original
approval, showing "work that has been done, work that will be
going on and work to close out the program"; (b) an engineer's
report concerning the "status of the condition of the site"; and
(c) a final concept plan showing "what will bring the site to
what was originally intended per the approved permit."  ECF No.
93-14 at 16.  This motion was approved unanimously as well.

The Commission also added five new requirements to the
original conditions as follows: (1) Condition 3, dealing with
Handsome's proposal to improve Garder Road, was amended to
require Handsome to submit a road improvement plan for approval
by the Commission; (2) Condition 4, dealing with landscaping,
was amended to require that a landscape plan be submitted for
approval by the Commission; (3) Condition 5, dealing with
progress reports, was amended to require Handsome to submit
progress reports for each 60-day period covered by the original
approval, and to submit progress reports every 60 days once work

resumed at the site, "including a calculation of remaining material to be removed"; (4) Condition 6, prohibiting removal of topsoil, was amended to require Handsome to provide verification that the quantity of stockpiled topsoil at the site was sufficient to provide 6 inches of coverage over all disturbed areas; and (5) Condition 9, dealing with trash dumpsters and related equipment, was amended to require Handsome to provide verification that equipment of this nature was being kept in proper condition within enclosed facilities.  See ECF No. 93-22.

The Commission then set the amount of the restoration bond at $100,000, the amount recommended by Mr. Schatzlein.[12] Handsome's engineer, Mr. Bjorklund, had estimated that the cost to restore the site would be $50,000.  But Mr. Schatzlein took the position that the Town would have to pay the higher amount to have the work completed via the Town's bidding and contracting process.[13]

Plaintiffs appealed to the Superior Court challenging the the commencement date of the extension's five-year term, the changes in the conditions of approval, and the requirement of a

---

12 Conn. Gen. Stat. 8-3(g)(1) provides that a zoning commission may, as a condition of approval of a site plan, require a bond to ensure that certain work is completed. A restoration bond provides security for the expected cost of restoring a site to its previous condition.
13 See ECF No. 93-16 at 6 (deposition of Mr. Schatzlein on July 23, 2012).

$100,000 restoration bond.  See Handsome, Inc. v. Planning &
Zoning Comm'n of Monroe, No. CV116019523S, 2012 WL 6901173
(Conn. Super. Ct. Dec. 21, 2012), vacated, 317 Conn. 515, 119
A.3d 541 (2015).  The Commission responded that Handsome lacked
standing to appeal as a result of the judgment of strict
foreclosure in favor of MD Drilling.  With regard to the merits,
the Commission argued that the extension's commencement date was
properly keyed to the expiration date of the original permit, no
material changes had been made to any of the previous conditions
of approval, and the requirement of a $100,000 restoration bond
was authorized by the original permit.

On June 7, 2011, ZEO Chapman issued a letter addressed to
"Mr. Todd Cascella Dba Handsome Inc." captioned "Cease and
Desist Order."  ECF No. 170-45.  The letter stated that work was
continuing at the site in violation of numerous conditions of
the permit, including the requirement of a $100,000 bond, and
ordered that all grading and removal of earth or soil cease
immediately.  The letter notified Mr. Cascella that he had
thirty days to appeal the order to the Zoning Board of Appeals
pursuant to Conn. Gen. Stat. § 8-7.  Plaintiffs did not appeal.
Mr. Chapman subsequently brought an action in Connecticut
Superior Court against Handsome and the Cascellas seeking to

22

compel compliance with the order.  See Joseph Chapman, et al. v. Handsome, Inc. et al., Case No. FBT CV-11-6020905 (Conn. Super. Ct. filed Aug. 29, 2011) ("the zoning enforcement action").

On December 21, 2012, the Connecticut Superior Court sustained the appeal from the Commission's action on the extension.  See Handsome, Inc. v. Planning & Zoning Comm'n of Monroe, No. CV116019523S, 2012 WL 6901173 (Ct. Super. Ct. Dec. 21, 2012).  The court ruled that the judgment of strict foreclosure did not deprive Handsome of standing to appeal, especially in view of Handsome's agreement with MD Drilling; the Cascellas had standing because they owned and operated Handsome and derived income from the site; the extension's five-year term could not begin to run until all litigation arising from the appeal was concluded; the Commission lacked authority to impose conditions that varied from the original conditions; and the requirement of a $100,000 bond was tainted by an unauthorized executive session.

The Commission sought certification to appeal, which was granted, and the appeal was transferred from the Connecticut Appellate Court to the Connecticut Supreme Court.  While the appeal was pending, the Town withdrew the zoning enforcement action.

23

On July 14, 2015, the Connecticut Supreme Court vacated the
judgment entered on the appeal and ordered that the appeal be
dismissed.  See Handsome, Inc. v. Planning & Zoning Comm'n of
Monroe, 317 Conn. 515 (2015) (hereinafter "Handsome, Inc.").
The Court agreed with the Commission's argument that Handsome
lacked standing to appeal because title to the property had
passed to MD Drilling on June 30, 2010, more than ten months
before the commission granted the permit extension.  Id. at 529-
30.  The Court stated:

> In the present case, apparently unbeknownst to the
> commission, Handsome lost title to the property before
> the permit extension proceedings because it had failed
> to pay its debt to the lienor, to obtain an extension
> of the law day, or to file a motion to open and modify
> the judgment in order to avoid this consequence.
> Accordingly, we conclude that Handsome had no standing
> to bring the appeal because, having lost title to the
> property, it was not aggrieved by the commission's
> decision to impose conditions in connection with the
> permit extension.

Id.

The Court ruled that the Cascellas also lacked standing to
appeal the Commission's grant of the extension.  They were not
aggrieved by the Commission's action because they had no direct
ownership interest in the property, no partnership agreement
with Handsome to develop the property, and no relationship with
MD Drilling.  Moreover, in dealing with the Commission, they had

24

acted in their capacities as corporate officers representing the
interest of Handsome, not as individuals with their own distinct
interests.

Justice Palmer dissented.  In his view, Handsome satisfied
the test of classical aggrievement, which extends standing to
appeal zoning decisions to nonowners of land who have a
"specific, personal and legal interest" that has been "specially
and injuriously affected." Cambodian Buddhist Society of
Connecticut, Inc. v. Planning & Zoning Comm'n of Newton, 285
Conn. 381, 394 (2008).  These elements were satisfied, he
explained, because Handsome had been "in possession of and
operated an excavation business on the property for more than
one decade." Handsome, Inc., 317 Conn. at 542.  And, under
Handsome's agreement with MD Drilling, it was entitled to
"remain in possession of the property . . . continue its
excavation operation and related activities . . . and . . .
regain title to the property." Id.  Justice Palmer discussed
decisions in analogous cases extending standing to nonowner
developers, in particular, the Court's decision in Moutinho v.
Planning & Zoning Commission of Bridgeport, 278 Conn. 660, 664
(2006).  The majority did not disagree with Justice Palmer's
analysis of the classical aggrievement issue but instead

declined to reach the issue on the ground that it had not been properly preserved.

In addition to appealing the Commission's grant of the extension subject to new requirements, plaintiffs also filed a complaint with the Freedom of Information Commission challenging the legality of the executive session that preceded the vote on the extension.  The FOIC held a hearing to consider whether the executive session was authorized by a provision of Connecticut's Freedom of Information Act that allows public agencies to convene executive sessions to discuss "strategy and negotiations with respect to pending claims or pending litigation to which the public agency . . . is a party."  Conn. Gen. Stat. § 1-200(6)(B).  At the hearing, the FOIC received evidence and heard testimony concerning what was discussed during the executive session.

The FOIC decided that the "pending claims or pending litigation" exception did not apply.  The FOIC found that the discussion during the executive session encompassed two topics: how to respond to the decision of the Superior Court sustaining Handsome's appeal from the denial of the extension; and how to address Handsome's noncompliance with the conditions of the original permit.  The FOIC determined that the first topic was

not covered by the exception because the case was no longer
pending, and the second topic was not covered because at the
time of the executive session there was no pending claim or
litigation regarding violations of the special permit.  The FOIC
specifically found that although the executive session included
discussion of various options for addressing Handsome's
noncompliance, there was no discussion of bringing a zoning
enforcement action.

The Superior Court reversed the FOIC's decision.  The Court
agreed that the "pending claims or pending litigation" exception
did not apply to the discussion of the prior decision on the
zoning appeal or Mr. Rinelli's letters.  Planning & Zoning
Comm'n of Monroe v. Freedom of Information Comm'n, No.
CV126015308S, 2013 WL 4779563, at *7 (Conn. Super. Ct. Aug. 13,
2013).  However, it concluded that "the executive session was
properly called to discuss the steps, short of litigation, that
[the Commission] might take to enforce its legal rights."  Id.

The Connecticut Supreme Court reversed.  See Planning &
Zoning Comm'n of Monroe v. Freedom of Info. Comm'n, 316 Conn. 1
(2015).  The Court stated that the FOIC's decision was not
entitled to any special deference because the case "present[ed]
an issue of statutory construction" that had never been "subject

27

to judicial scrutiny." Id. at 9.  However, the Court concluded that the executive session did violate the Act.  The Court stated that the Commission was "not justified in convening an executive session under § 1-200(6)(B) to discuss its zoning enforcement options with respect to Handsome's original permit because, at that time, there was no pending litigation regarding the permit . . . and there was no pending or prospective litigation regarding Handsome's alleged permit violations." Id. at 13-14.

## II.  Procedural History

In July 2011, plaintiffs commenced this action in Connecticut Superior Court.  The action was filed in the wake of the Commission's decision granting the extension subject to new requirements and ZEO Chapman's issuance of the cease-and-desist order.  Named as defendants were the Town, the Commission, Town Engineer Schatzlein, Commission Chair Richard Zini and alternate Karen Martin.  The complaint sought damages for alleged violations of the plaintiffs' rights to due process and equal protection.  No claim was made under the First Amendment.

The defendants removed the action to this Court, then moved to dismiss the complaint.  In support of the motion to dismiss, they argued that the allegations of the complaint were

insufficient to state a claim for relief, the claims were not ripe due to the pendency of the second zoning appeal, and the individual defendants were entitled to qualified immunity.

In February 2012, plaintiffs moved for leave to file an amended complaint.  They stated that the proposed amended complaint would reflect recent developments bearing on the due process and equal protection claims.  In addition, it would include a claim that the Commission had retaliated against Handsome for appealing the denial of the extension in violation the First Amendment.  Plaintiffs explained that this new claim would be based on (1) the Commission's delay in complying with the Superior Court's order sustaining the appeal, and (2) the filing of the zoning enforcement action.  After briefing and oral argument, the motion to dismiss was denied and the motion to amend was granted in a detailed ruling. See ECF No. 36.

In July 2013, the defendants moved for summary judgment on all the claims.  After the motion was fully briefed, the defendants moved for a stay pending the outcome of the second zoning appeal, which was then pending before the Connecticut Supreme Court.  In February 2014, the motion was granted over the plaintiffs' objection.  The case was stayed and the motion for summary judgment was denied without prejudice to renewal

after the Connecticut Supreme Court ruled.  While the stay remained in effect, plaintiffs filed a second action in this Court.  Handsome, Inc. v. Town of Monroe, No. 3:14-cv-622 (D. Conn. filed May 5, 2014).  The complaint named new defendants allegedly involved in seeking to prevent Handsome from proceeding with its project at 125 Garder Road, specifically, First Selectman Vavrek, and Commission members Leneker, O'Hara and Parsell.  Because this second action was duplicative of the first one, the two actions were consolidated.  Plaintiffs then amended the complaint in the first action to add the new defendants and the second action was dismissed.

On February 17, 2015, plaintiffs filed an amended complaint that not only added the new defendants but also made new allegations.  ECF No. 145.  The defendants moved to strike the new allegations on the ground that they had been injected into the case without leave of court.  After briefing and argument, the motion to strike was granted.

On May 28, 2015, plaintiffs filed the third amended complaint ("TAC"), which is now the operative complaint.  ECF No. 159.  The defendants are the Town, the Commission, First Selectman Vavrek, Town Engineer Schatzlein, Commission members Zini, O'Hara, Parsell and Leneker and alternate Martin.  The TAC

contains three counts, each brought under 42 U.S.C. § 1983 on
behalf of all the plaintiffs against all the defendants.  Claims
are asserted under the Due Process Clause (count one), the First
Amendment (count two), and the Equal Protection Clause (count
three).  The relief sought is compensatory damages, punitive
damages, and attorneys' fees.

On October 5, 2015, the defendants moved for summary
judgment on all the claims in the TAC.  After briefing and
argument, I requested further briefing on the First Amendment
claim.  In particular, briefing was requested on the following
issues: (1) whether any defendant was personally involved in the
zoning enforcement action; (2) if so, what the record discloses
regarding his or her retaliatory motive; (3) assuming one or
more individuals had a retaliatory motive, the basis for
imputing liability to the Commission and the Town; and (4) the
applicability of the Noerr-Pennington doctrine.

Supplemental briefs were filed and additional arguments
were presented in January 2017.  In their supplemental
submissions, plaintiffs took the position that the retaliation
claim is based on "the whole chronology of treatment and events
over a period of years beginning with the refusal to renew the
site approval in 2008 because Handsome had filed an affordable

housing application."  ECF No. 202 at 10.  Defendants objected
that this was a "misstatement" of the retaliation claim.  ECF
No. 203 at 5.

In 2017, while the motion for summary judgment was under
submission, Ms. Cascella filed a bankruptcy petition under
Chapter 11.  In re Cascella, No. 17-50598 (Bankr. D. Conn. May
25, 2017), ECF No. 1.  Her interest in the present lawsuit was
included in an amended schedule with an estimated value of
$1,980,000.  Amended Schedules at 7, No. 17-50598, ECF No.
38.  In due course, the bankruptcy case was converted to a case
under Chapter 7.  No. 17-50598, ECF No. 136.  On August 28,
2018, Ms. Cascella received a discharge under 11 USC § 727.  No.
17-50598, ECF No. 151.  Her interest in this lawsuit was
abandoned by the bankruptcy trustee.

In 2018, Handsome also filed a bankruptcy petition under
Chapter 11.  In re Handsome, Inc., No. 18-50122 (Bankr. D. Conn.
Feb. 1, 2018), ECF No. 1.  The petition listed the property at
125 Garder Road.  On December 13, 2018, the bankruptcy case was
dismissed pursuant to 11 U.S.C. § 1112(b) based on Handsome's
inability to reorganize or propose a confirmable plan.  No. 18-
50122, ECF No. 103.

The current owner of the property at 125 Garder Road has

filed an application for an excavation permit enabling it to
excavate the entire site.[14]

### III. Discussion

Land use disputes often lead to litigation in federal court
under § 1983.  But property owners have long had difficulty
prevailing on any theory of liability.  In this case,
plaintiffs' claims withstood a motion to dismiss but I conclude
that they cannot withstand the renewed motion for summary
judgment.

Unlike a motion to dismiss, which tests whether the
plaintiff's allegations, accepted as true, satisfy the elements
of a legal claim on which relief may be granted, a motion for
summary judgment tests whether evidence in the record would
permit a jury to return a verdict in favor of the plaintiff.
See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

Under Federal Rule of Civil Procedure 56(c), summary
judgment may be granted "if the pleadings, the discovery and
disclosure materials on file, and any affidavits show that there
is no genuine issue as to any material fact."  An issue of fact
is "genuine" if it could be resolved in favor of the plaintiff;
an issue of fact is "material" if it has an effect on the

---

14 125 Garder Road, Vision Gov't Solutions: Records of Town of Monroe,
available at https://gis.vgsi.com/monroect/Parcel.aspx?pid=12775.

outcome.

In determining whether this standard is met, evidence favorable to the plaintiff must be credited if a jury could credit it, and the plaintiff must be given the benefit of all reasonable inferences supported by the evidence.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); see also Adickes v. S.H. Kress & Co., 398 U.S. 144, 156 (1970).  In addition, evidence favorable to the defendant may be disregarded unless it is undisputed or comes from a neutral source and is uncontradicted and unimpeached.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150-51 (2000).  To defeat a properly supported motion for summary judgment, a plaintiff "may not rest upon mere conclusory allegations or denials."  Podell v. Citicorp Diners Club, 112 F.3d 98, 101 (2d Cir. 1997).  Instead, a plaintiff must provide sufficient "affirmative evidence" to permit a jury to reasonably find that all the essential elements of the claim have been proven.  Anderson, 477 U.S. at 257.  "If little or no evidence supports the non-moving party's case, there is no genuine issue of material fact and summary judgment may be appropriate."  Santana v. City of Hartford, 283 F. Supp. 2d 720, 725 (D. Conn. 2003) (citing Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219,

34

1223-24 (2d Cir. 1994)).

Applying these standards, I conclude that the evidence does not raise a genuine issue of material fact with regard to the claims against any of the defendants and that the individual defendants are entitled to qualified immunity as a matter of law.

## A. Standing and the Statute of Limitations

Defendants make two arguments that need to be addressed before turning to consider whether the evidence raises a genuine issue of material fact with regard to plaintiffs' claims. Defendants argue that the case must be dismissed for lack of subject matter jurisdiction because plaintiffs lack standing as required by Article III of the United States Constitution.  In addition, they argue that the statute of limitations bars certain claims.  Both arguments are correct in some respects but not all.

Standing refers to the personal stake a plaintiff must have in a disputed issue in order to be able to obtain a judicial determination of the issue.  See Warth v. Seldin, 422 U.S. 490, 498 (1975).  To have standing under Article III, "a plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the

requested relief." Allen v. Wright, 468 U.S. 737, 738
(1984), abrogated on other grounds by Lexmark Int'l, Inc. v.
Static Control Components, Inc., 572 U.S. 118 (2014).  The
standing requirement must be satisfied with regard to each claim
and form of relief.  Town of Chester, N.Y. v. Laroe Ests., Inc.,
581 U.S. 433, 439 (2017).

Defendants contend that none of the plaintiffs has standing
under Article III to complain about injuries caused by allegedly
unlawful action that occurred after Handsome lost title to the
property at 125 Garder Road.  They rely on the Connecticut
Supreme Court's decision ordering that the second zoning appeal
be dismissed due to Handsome's loss of title.  For reasons
discussed below in the section addressing the due process claim,
I do not think Handsome's loss of title is dispositive.  Those
same reasons lead me to conclude that the loss of title does not
deprive Handsome of standing to litigate the claims in the TAC.

Defendants argue that the Cascellas lack standing because
the injuries they complain about are derivative of injuries to
Handsome. I agree that only Handsome has standing to seek
compensation for economic injuries it sustained as a result of
the allegedly unlawful failure to renew the special permit with
no change in conditions.  See Jones v. Niagara Frontier Transp.

36

Auth., 836 F.2d 731, 736 (2d Cir. 1987); Royal Crown Day Care
LLC v. Dep't of Health & Mental Hygiene of New York, No. 10-CV-
5442(MKB), 2012 WL 2992124 (E.D.N.Y. July 20, 2012), aff'd 746
F.3d 538 (2d Cir. 2014); Caravella v. City of New York, 79 Fed.
App'x 452, 453 (2d Cir. 2003).  However, the Cascellas have
standing to seek redress for emotional distress arising from
allegedly unlawful actions directed against them personally, in
particular, the zoning enforcement action.

Defendants argue that the three-year statute of limitations
applicable to actions under § 1983 bars any claims against the
original defendants (the Town, the Commission, Town Engineer
Schatzlein and Commissioners Zini and Martin) based on the
Commission's decision of April 24, 2008, denying Handsome's
request for an extension of the special permit.  They further
contend that the statute of limitations bars any claims against
the later-named defendants (First Selectmen Vavrek and
Commissioners O'Hara, Parsell and Leneker) based on conduct that
took place prior to the Commission's action of May 5, 2011,
granting the extension subject to new requirements.

Plaintiffs respond that no claims in the TAC are barred by
the statute of limitations because of the continuing violation
doctrine. Under this doctrine, "[w]hen a plaintiff experiences a

37

'continuous practice and policy of discrimination . . . the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it.'" Jaghory v. New York State Dep't of Educ., 131 F.3d 326, 331 (2d Cir. 1997) (quoting Cornwell v. Robinson, 23 F.3d 694, 703 (2d Cir. 1994)).  The doctrine "does not apply to discrete acts, but only to ongoing circumstances that combine to form a single violation that 'cannot be said to occur on any particular day.'" Deters v. City of Poughkeepsie, 150 Fed. Appx. 10, 12 (2d Cir. 2005) (quoting National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002)).

Defendants contend that the continuing violation doctrine does not apply because the claims in the TAC are based on several discrete actions, each of which could constitute a separate violation on its own.  I agree.  See Shomo v. City of New York, 579 F.3d 176, 181 (2d Cir. 2009) ("[U]nder Morgan, the continuing violation doctrine can be applied when the plaintiff's claim seeks redress for injuries resulting from a series of separate acts that collectively constitute one unlawful act, but the doctrine cannot be applied when the plaintiff challenges conduct that is a discrete unlawful act.") (internal quotations omitted); Golodner v. City of New London,

No. 314-CV-00173-VLB, 2015 WL 1471770, at *2 (D. Conn. Mar. 31, 2015) ("An allegation of several unlawful acts, even similar ones, does not, in and of itself, establish a continuing violation.") (internal quotations omitted).  See also Sherman v. Town of Chester, 752 F.3d 554 (2d Cir. 2014) (applying continuing violation doctrine to taking claim because complaint alleged series of maneuvers that constituted a taking when considered together, no single maneuver was unconstitutional when considered in isolation, and it could not be said plaintiff's property was taken on any particular day).

In practical terms, the statute of limitations bars claims based on the denial of the extension on April 4, 2008, but not the other claims.  Because the claims based on the extension denial are time-barred, it is unnecessary to address them.  However, the parties' briefs address the claims on the merits.  Accordingly, in the interest of completeness, I address the claims on the merits as if they were not time-barred.

B. Due Process Claims

1. Grant of Permit Extension Subject to New Requirements

Count one of the TAC alleges that the Commission's imposition of new requirements on the permit extension following the first zoning appeal deprived plaintiffs of a

39

constitutionally protected property interest in violation of the
Due Process Clause of the Fourteenth Amendment.  Plaintiffs
allege violations of both procedural and substantive due
process.  To prevail on either type of claim, plaintiffs must
demonstrate that Handsome had a clear entitlement to an
extension without the new requirements.  Natale v. Town of
Ridgefield, 170 F.3d 258, 263 (2d Cir. 1999) (finding that
applicant for permit who sues official for denying permit has no
Fourteenth Amendment claim for deprivation of property without
due process unless "he had a clear entitlement to the permit
under state law.").[15]  To prevail on a procedural due process
claim, they must prove that they were deprived of a
constitutionally protected property interest without being
afforded procedural safeguards guaranteed by the Fourteenth
Amendment.  See RR Village Ass'n, Inc. v. Denver Sewer Corp.,
826 F.2d 1197, 1201-02 (2d Cir. 1987).  To prevail on a
substantive due process claim they must prove that the
defendants' action was arbitrary in the constitutional sense,

---

15 The clear entitlement test governs both procedural and substantive due
process claims.  See Gagliardi v. Vill. of Pawling, 18 F.3d 188, 193 (2d Cir.
1994) (applying same analysis to both substantive and procedural due process
claims because infringement of a procedural right "is not actionable when
there is no protected right at stake"); DeFalco v. Dechance, 949 F. Supp. 2d
422, 433 (E.D.N.Y. 2013) (granting motion to dismiss both substantive and
procedural due process claims based on lack of protected property interest).

meaning "conscience-shocking," rather than merely "incorrect or ill-advised."  Ferran v. Town of Nassau, 471 F.3d 363, 369-70 (2d Cir. 2006); see Natale, 170 F.3d at 259 (to find defendant liable for substantive due process violation based on refusal to issue permit, jury must find that defendant deprived plaintiff of constitutionally protected property interest by conduct "so outrageously arbitrary as to constitute a gross abuse of governmental authority.")

Under the clear entitlement standard, plaintiffs must show that the Commission, in granting the permit extension, lacked discretion to add the new requirements.  See Clubside, Inc. v. Valentin, 468 F.3d 144, 154 (2d Cir. 2006) (clear entitlement analysis "turns on the degree to which state and local law unambiguously limits the Board's discretion"); RRI Realty Corp. v. Incorp. Vill. of Southampton, 870 F.2d 911, 918 (2d Cir. 1989) (entitlement to  benefit arises only when discretion of issuing agency "is so narrowly circumscribed that approval of a proper application is virtually assured"; "[e]ven if in a particular case, objective observers would estimate that the probability of issuance was extremely high, the opportunity of the local agency to deny issuance suffices to defeat the existence of a federally protected property interest."); Natale,

170 F.3d at 263 n.1 (to establish federally protected property interest in permit, "plaintiff must show that, at the time the permit was denied, there was no uncertainty regarding his entitlement to it under applicable state and local law, and the issuing authority had no discretion to withhold it in his particular case.").

The Second Circuit has instructed that the clear entitlement standard must be applied "with considerable rigor" to avoid turning federal courts into zoning boards of appeals. RRI Realty Corp., 870 F.2d at 918. Rigorous application of the clear entitlement standard "appropriately balances the need for local autonomy, with recognition of constitutional protection at the very outer margins of municipal behavior . . . . It also recognizes that the Due Process Clause does not function as a general overseer of arbitrariness in state and local land-use decisions; in our federal system, that is the province of the state courts." Zahra v. Town of Southold, 48 F.3d 674, 680 (2d Cir. 1995).

Defendants contend that plaintiffs lacked a constitutionally protected interest. They rely on the Connecticut Supreme Court's decision on the second zoning appeal. I agree with the logic of defendants' argument that a

42

person who is not aggrieved by the denial of a special permit
for purposes of standing to bring an administrative appeal
cannot establish a clear entitlement to the same permit for
purposes of a due process claim under § 1983.  As discussed
above, however, the Connecticut Supreme Court declined to
consider whether plaintiffs satisfied the elements of classical
aggrievement, finding any such argument procedurally barred.  If
the majority had considered the argument on the merits, it might
well have decided that plaintiffs satisfied the test of
classical aggrievement, notwithstanding Handsome's loss of
title, for the reasons set forth in Justice Palmer's dissenting
opinion. Accordingly, I do not think the decision is dispositive
here.

I conclude that, assuming Handsome's loss of title did not
disqualify it from seeking an extension (with the acquiescence
of MD Drilling), or continuing with the appeal from the denial
of the extension, the clear entitlement standard requires that
summary judgment be granted to the defendants on the due process
claim.

Section 117-1701 of the Town of Monroe Zoning Regulations
authorized the Commission to grant a special permit, "subject to
appropriate conditions and safeguards," if it found that the

43

proposed use would "not be detrimental to the health, safety, welfare and property values in the neighborhood" and would "be in harmony with and conform to the orderly development of the town."  This language confers a significant degree of discretion.

Based on the parties' submissions, and independent research, state and local law did not unambiguously prohibit the Commission from imposing "appropriate conditions and safeguards" when granting the permit extension on the remand.

The decision on the appeal contained no such prohibition. In this respect, the decision was consistent with longstanding practice in Connecticut whereby courts sustaining zoning appeals refrain from ordering a specific disposition of the matter in order to avoid improper encroachment on the administrative functions of zoning boards.  See Robert Fuller and Dwight Merriam, 9A Connecticut Practice Series: Land Use Law and Practice (4th ed. 2022) § 35:1 (citing Thorne v. Zoning Comm'n of Old Saybrook, 178 Conn. 198, 206 (1979)).  Under this approach, a court is authorized to issue an order directing a commission to take specific action only when, as a matter of law, no other action would be lawful.  See Schwartz v. Planning & Zoning Comm'n of Hamden, 208 Conn. 146, 155-56 (1988).  On the

rare occasions when courts have ordered that an application for
a special permit be approved, they have given the commission an
opportunity to subject the approval to reasonable terms and
conditions.  See <u>Chevron Oil Co. v. Zoning Bd. Of Appeals of
Shelton</u>, 170 Conn. 146 (1976) (example of rare case in which the
Connecticut courts ordered a zoning agency to take a particular
action); <u>see also</u> Tondro Treatise at 619.[16]

In this case, the court ruled that the Commission had no
option but to grant the extension.  But it went no further.  In
the absence of a more specific directive, the Commission's duty
was to grant the extension in accordance with the principles
contained in the court's opinion and other applicable law.
Defendants argue that no statute, regulation or case law
prohibited the Commission from adding conditions when renewing a
special permit, and a published decision indicated it was
permissible.  See <u>Blinkoff v. Planning & Zoning Comm'n of
Torrington</u>, No. CV 980078081S, 1999 WL 459585 (Conn. Super. Ct.
June 23, 1999) ("Over the course of the seven (7) approvals from
1988 through 1996, and the ten (10) years of quarry operations,

---

16 In <u>Yale Auto Parts v. Johnson</u>, 758 F.2d 54, 58-59 (2d Cir. 1985), the
Second Circuit recognized that Connecticut land use commissions generally
exercise a significant degree of discretion in deciding whether to issue a
permit because successful administrative appeals are rarely remanded with
directions to enter a specific result.  See Tondro Treatise at 501.

the Torrington Zoning Board of Appeals and subsequently the
Torrington Planning & Zoning Commission placed conditions upon
the renewal of the Special Exception Permit, in order to make
certain that O&G's operation complied with the Torrington Zoning
regulations."). Plaintiffs have not shown that defendants'
argument is incorrect.

Accordingly, I conclude that the Commission had discretion
to grant the extension subject to new requirements in accordance
with its regulations.

Plaintiffs assert that the new requirements imposed by the
Commission following the appeal were designed to "kill[] the
plaintiffs' project" in defiance of the judgment of the Superior
Court. See TAC, ECF No. 159 ¶ 41. I agree that the Commission
did not have authority to impose unreasonably onerous conditions
at odds with the court's ruling. But the evidence does not
support a finding that the new requirements were unreasonably
onerous or conflicted with the ruling in any respect.

Plaintiffs complain that the retroactive setting of the
commencement date of the permit extension's five-year term was
illegal and contrary to the terms of the original permit.
Defendants respond that it was necessary to force Handsome to
move forward with the permitted project expeditiously, the

46

original permit required Handsome to complete the building within two years, and counsel advised them a further extension could be granted in the future if necessary.  Plaintiffs dispute defendants' version of events but they do not dispute that state law would have allowed them to get another extension in the future.

As detailed above, the Commission approved a motion requiring Handsome to submit (1) reports showing what work had been done at the site and what work still needed to be done; (2) an engineer's report concerning the status of the conditions at the site; and (3) a final concept plan showing what Handsome would do "to bring the site to what was originally intended per the approved permit."  ECF No. 93-14 at 16.  In addition, amendments to the original conditions required Handsome to submit a road improvement plan, landscaping plan, progress reports, verification that there was enough stockpiled topsoil to provide coverage for all disturbed areas, and verification that dumpsters and related equipment were properly maintained and stored.  Finally, the Commission accepted Mr. Schatzlein's recommendation that the amount of the restoration bond be set at $100,000.

Viewed objectively, these new requirements were reasonable

47

in the circumstances and compatible with the judgment.  The
original permit required Handsome to prepare the site for the
approved building within one year, submit progress reports every
60 days until preparation of the site for the building was
complete, then construct the building within one year.  During
the five-year term of the permit, Handsome operated an
excavation business on the property.[17]  Only a handful of 60-day
progress reports were submitted and only when they were
specifically requested.

In sustaining the appeal, the court determined that
Handsome's lack of progress on the permitted project and its
failure to submit progress reports did not warrant denying an
extension.  However, nothing in the court's decision suggested
that the Commission would overreach if it required Handsome to
provide reports showing what work had been done, what work
remained to be done, the status of the conditions at the site
and what it planned to do to complete the project authorized by
the permit.  These requirements were not unduly burdensome for
an applicant in Handsome's position seeking to go forward with
the permitted project.

---

17 Plaintiffs object to this characterization but it is not unfair.  See
Handsome, Inc., 317 Conn. at 542 (Palmer, J., dissenting) ("Handsome . . .
has been in possession of and operated an excavation business on the property
for more than one decade.").

48

The same is true of the amendments to the conditions.  The amendments did not intensify the original conditions to a significant degree.  If the approved building was going to be constructed, road improvement and landscaping plans would have to be submitted at some point.  The amendments did not require Handsome to submit the reports before resuming work at the site.[18]  The amendment requiring Handsome to submit progress reports every 60 days gave effect to the same requirement in the original permit.  The amendment requiring Handsome to verify that the quantity of stockpiled topsoil would provide adequate coverage for all disturbed areas aligned with the original permit's prohibition on the removal of any topsoil from the site.  And the amendment regarding dumpsters and related equipment did not require Handsome to do anything at the site beyond what was already required by the original permit.

Finally, with regard to the $100,000 restoration bond, the original permit authorized the Commission to require Handsome to post a restoration bond before starting work.  Nothing in the court's opinion suggested that Handsome was entitled to an extension without the requirement of a restoration bond.

Plaintiffs allege that Mr. Schatzlein recommended a bond in

18 The record reflects that a 30-day deadline was set initially but then withdrawn.

the amount of $100,000, knowing Handsome could not afford such a high bond, for the purpose of putting an end to the project.[19] Plaintiffs point to their own engineer's cost estimate of $50,000, which was given to Mr. Schatzlein before he recommended the higher bond.

The record does not support a finding that setting the amount of the bond at $100,000 exceeded the Commission's authority following the appeal.  The $50,000 estimate was based on what it would cost Handsome to have the work done, as opposed to what the Town would have to pay a third party in the event Handsome defaulted.  Plaintiffs have not presented evidence permitting a reasonable finding that the Town could get a third party to do the work for significantly less than $100,000.

Plaintiffs contend that Handsome had a constitutionally protected property interest in the permit itself.  However, it is a basic tenet of zoning law that a special permit, like a variance, runs with the land.  See International Investors v. Town Plan & Zoning Comm'n of Fairfield, 344 Conn. 46, 62-63 (2022) (citing 3 E. Ziegler, Rathkopf's The Law of Zoning and

---

19 Plaintiffs also allege that there was a "longstanding policy of not requiring a restoration bond until site preparation had been completed." Pls.' Opp'n (ECF No. 182) at 46.  However, the record establishes that the policy changed under Mr. Schatzlein, who believed that a bond should be posted sooner.

Planning § 61:50, at 61-136 (4th ed. 2011) ("The [special] permit is not, and cannot be, personal to the applicant, but runs with the land.  A transferee of the land succeeds to any benefits that the original grantee of the permit enjoyed, as well as being subject to its conditions."); see also TWK, LLC v. Zoning Board of Appeals, Docket No. CV-97-400324-S, 1999 WL 30815, *4 (Conn. Super. Ct. Jan. 8, 1999) ("Like a variance, a special permit . . . is a legal status granted to a certain parcel of realty without regard to ownership . . . . A successor in interest to such realty succeeds to the benefits and to the conditions of a land use permit to which the realty is subject.") (internal quotations omitted).  Because a special permit runs with the land, "personal conditions" on a special permit are invalid.  See International Investors, 344 Conn. at 63-64.[20]

Plaintiffs argue that they had a clear entitlement not to be subjected to arbitrary and irrational actions on the part of the Commission.  Unless they were clearly entitled to an

---

20  That the permit was recorded in the land records of the Town has no bearing on whether plaintiffs had a property interest in the permit.  The act of recording, which is necessary to make the permit effective under Connecticut General Statutes § 8-3d, does not serve to create a personal property interest in the grantee.  Rather, it provides notice of the permit to potentially interested parties consistent with the basic tenet that a permit runs with the land.  See International Investors, 344 Conn. at 61.

extension without the new requirements, however, they cannot establish that their right to due process was violated.  See Yale Auto Parts, Inc. v. Johnson, 758 F.2d 54 (2d Cir. 1985) (in absence of protected property interest, no due process violation even though city engaged in "egregious misconduct"); see also Kelley Property Development, Inc. v. Town of Lebanon, 226 Conn. 314, 322 (1993) ("If a claimant does not establish a constitutionally protected interest, the due process analysis ceases because no process is constitutionally due for the deprivation of an interest that is not of constitutional magnitude.").

Moreover, the evidence does not support a reasonable finding that the Commission's action on the extension violated either procedural or substantive due process.

Plaintiffs allege that the new requirements were imposed pursuant to a multi-step scheme, agreed to during an illegal executive session, whereby the Commission would impose unreasonably onerous requirements on the extension, ZEO Chapman would serve a cease-and-desist order on Handsome based on its predictable noncompliance, and the Town would commence an action against Handsome to enforce the cease-and-desist order, thus putting an end to the project.

52

Plaintiffs' theory is at odds with the FOIC's findings concerning what was discussed during the executive session, as well as the deposition testimony of witnesses who attended the executive session, including Attorney McCreery.[21]  But even assuming a jury could reasonably find that the defendants did undertake to shut-down the project, as plaintiffs claim, a conspiracy is not actionable under § 1983 in the absence of a constitutional violation.  See Dean Tarry Corp. v. Friedlander, 826 F.2d 210, 213-14 (2d Cir. 1987) (dismissing conspiracy claim because no deprivation of constitutional right).  The process the Commission followed in deciding to grant the extension subject to the new requirements was not so defective as to violate procedural due process, and the new requirements were not so arbitrary as to violate substantive due process.

With regard to procedural matters, the discretionary nature of the Commission's action prevents plaintiffs from establishing a violation of procedural due process.  See Gagliardi v. Village of Pawling, 18 F.3d 188, 193 (2d Cir. 1994).  In addition, the availability of post-deprivation judicial review is usually sufficient to satisfy the requirements of procedural due process

---

21 Plaintiffs argue that a jury could disbelieve the witnesses' testimony because the executive session was conducted off-the-record in violation of Connecticut's Freedom of Information Act.

in the land use context.  See generally Dean v. Town of
Hempstead, 527 F. Supp. 3d 347, 427-430 (E.D.N.Y. 2021).
 Plaintiffs have not shown that a different result is warranted
here.

The Commission's administrative process on the remand did
not deprive plaintiffs of safeguards required to satisfy
constitutional standards.

Plaintiffs complain that the Commission failed to act on
the extension in a timely manner.  No statute, regulation or
case law has been cited or found establishing a time limit
within which the Commission was required to act.[22]  The record
does show that the extension was placed on the Commission's
agenda not long after the tax foreclosure proceeding was
resolved.[23]  Plaintiffs have not shown that Handsome had a
constitutional right to receive a decision on the extension
while the tax foreclosure proceeding was pending.

Plaintiffs further complain that the defendants failed to
provide advance notice that the extension would be addressed by
the Commission at the meeting on May 5, 2011.  But state law did

---

[22] Generally, the Commission is obligated to act within 160 days of receiving
an application on which a public hearing is held.  See Tondro Treatise at
427.
[23] The parties' submissions do not identify the person(s) involved in
commencing and maintaining the tax foreclosure proceeding.

not obligate the Commission to hold a public hearing on the remand.  Instead, it permitted the Commission to resume deliberations on the application without reconvening the public hearing.  In addition, Handsome did receive notice of the meeting and Mr. Cascella attended the meeting along with his counsel.  Plaintiffs complain that the executive session violated Connecticut's Freedom of Information Act.  However, they have not shown that the Commission's failure to deliberate in public violated Handsome's rights under the Due Process Clause.

Plaintiffs further complain that Handsome was deprived of its right to an impartial decisionmaker, pointing to Ms. Martin's attendance at the executive session notwithstanding her recusal.[24]  There is no evidence that she participated in the deliberations regarding the permit extension and she did not

---

24 In support of their due process claim, plaintiffs rely on Ms. Martin's filing in April 2008 of a petition to have the Commission designate a section of Garder Road as a scenic road.  Ms. Martin was not a member of the Commission at the time.  A few years earlier, another section of Garder Road had been designated as a scenic road pursuant to a petition supported by a number of residents, including the Cascellas.  Ms. Martin's petition was rejected on the ground that it failed to meet statutory frontage requirements.  Plaintiffs argue that the petition would have prevented the affected section of Garder Road from being paved, which would impede completion of Handsome's project.  However, it is undisputed that another section of Garder Road had been paved notwithstanding its designation as a scenic road.  In November 2009, another petition to have a section of Garder Road designated as a scenic road was submitted to the Commission by a third party.  The driveways to Handsome's property and Ms. Martin's property were located in this section.  The petition was granted, but Ms. Martin recused herself from the discussion and did not vote.

vote on the matter.  Even assuming her presence during the executive session is sufficient to raise a genuine issue of fact concerning her role, the issue is not material.  Viewing the record most favorably to plaintiffs, a jury could not reasonably find that but for her involvement, the Commission would have reached a different decision.

With regard to substantive due process, plaintiffs allege that Mr. Schatzlein recommended a $100,000 restoration bond because he knew Handsome could not afford such a high bond. This allegation does not raise a genuine issue of material fact requiring a jury trial.  Mr. Schatzlein's legal duty was to recommend that the Commission require Handsome to post a bond in an amount that would protect the Town in the event Handsome defaulted.  In the absence of evidence that the Town could get the work done by a third party for significantly less than $100,000, a jury could not reasonably find the amount of the bond to be so outrageously arbitrary as to violate substantive due process.

Plaintiffs also complain about the retroactive setting of the commencement date of the extension's five-year term.  They assert that it would have been impossible to complete the project within that time, but the evidence does not support such

a finding.  Nor does it support a finding that the defendants
knew the project could not be completed within two years.  In
any case, because state law would have allowed for a further
extension, a jury could not reasonably find that the setting of
the commencement date was outrageously arbitrary.

Because plaintiffs have not raised a genuine issue of
material fact with regard to their due process claim predicated
on the events following the appeal, the claim must be dismissed
as to all the defendants, including the Commission and the Town.
See Morales v. City of New York, 752 F.3d 234, 238 (2d Cir.
2014) ("[H]aving properly dismissed [plaintiff's] underlying
constitutional claims against the individual . . . defendants,
the District Court also properly dismissed his claim against the
City . . . .").

I also conclude that the individual defendants are entitled
to summary judgment based on qualified immunity with regard to
this claim.  Qualified immunity shields government officials
from liability for damages "insofar as their conduct does not
violate clearly established . . . constitutional rights of which
a reasonable person would have known."  Harlow v. Fitzgerald,
457 U.S. 800, 818 (1982).  Under this standard, the dispositive
inquiry is whether it would have been clear to a reasonable

officer in the defendant's position that the conduct was
unconstitutional.  Saucier v. Katz, 533 U.S. 194, 202 (2001).

To overcome the qualified immunity defense as to any of the
individual defendants, plaintiffs must show that a reasonable
official in the defendant's position would have known that what
he or she was doing violated Handsome's right to due process.
Plaintiffs have not made this showing as to any of the
defendants.

Viewing the evidence in a light most favorable to
plaintiffs, I am satisfied that each of the individual
defendants is entitled to qualified immunity on the due process
claim as a matter of law.  No statute, regulation or judicial
decision made it clear that the procedures followed by the
Commission on the remand violated Handsome's right to procedural
due process.  And no statute, regulation or judicial decision
placed Handsome's right to an extension with no changes in the
conditions of approval "beyond debate."  Ashcroft v. Al-Kidd,
536 U.S. 731, 741 (2011).

## 2.   Denial of Permit Extension

Turning to the due process claim based on the denial of the
permit extension in 2008, defendants correctly argue that this
claim is time-barred, as discussed above.  Even so, I have

considered the claim on the merits.  Viewing the evidence in a manner most favorable to plaintiffs, I conclude that it is insufficient to satisfy their burden of proof with regard to the elements of this claim as well.

To prevail on this claim, plaintiffs must show that at the time Handsome applied for the extension, it was clearly entitled to an extension under state law.  They have not made this showing.

In sustaining plaintiffs' appeal from the denial of the extension, the Superior Court stated that the Commission had no option but to grant Handsome's application because there had been no material change in the facts and circumstances affecting the decision.  See Handsome, Inc. v. Monroe Planning & Zoning Comm'n, No. CV084025399, 2010 WL 4069761, at *6 (Conn. Super. Ct. Sept. 10, 2010).  As authority for its ruling, the Superior Court cited Haines v. Zoning Board of Appeals, 26 Conn. App. 187 (1991).  In that case, the Appellate Court reversed a judgment sustaining an appeal from a decision of a zoning board of appeals denying an application for a variance.  The board argued that it was not required to grant the variance, although a substantially similar variance had been granted to another person at an earlier time with regard to another parcel.  The

59

Appellate Court agreed with the board that it had discretion to deny the application.  The Court noted that the situation would have been different if the board had previously acted on the "same application relating to the same parcel."  26 Conn. App. at 191.  In such a situation, the Court explained, a zoning board of appeals is "prohibited from reversing the previous decision unless the facts and circumstances have materially changed so as to affect the reason for the original decision and no vested rights have intervened."  Id. at 191-92.

Defendants argue that the Superior Court's reliance on Haines was not foreseeable because a variance application is fundamentally different from an application for a special permit.  As they point out, a variance application asks a zoning board of appeals to override an existing regulation when enforcing the regulation would cause such unusual hardship as to constitute a taking of the property. See Conn. Gen. Stat. § 8-6(a)(3) ("The zoning board of appeals shall . . . determine and vary the application of the zoning bylaws, ordinances or regulations . . . solely with respect to a parcel of land where, owing to conditions especially affecting such parcel, . . . a literal enforcement of such bylaws ordinances or regulations would result in exceptional difficulty or unusual hardship.").

A special permit application asks a planning and zoning
commission to allow a use of property in accordance with zoning
regulations and conditions imposed by the commission in the
public interest.  See Conn. Gen. Stat. § 8-2(a)(3) (zoning
regulations "may provide that certain classes or kinds of
buildings, structure or uses of land are permitted only after
obtaining a special permit or special exception from a . . .
planning and zoning commission . . . subject to standards set
forth in the regulations and to conditions necessary to protect
the public health, safety, convenience and property values.").

I agree with defendants' argument.  The Superior Court's
reliance on the "materially changed circumstances" rule
recognized in Haines extends the rule well beyond the narrowly
limited circumstances in which the rule applies.  By its terms,
the rule provides that when a zoning board of appeals has
previously granted a variance with regard to a certain parcel,
and the same applicant seeks the same variance for the same
parcel, the board may refuse to grant the variance only if the
reason for granting the variance has been affected by a material
change in circumstances and no rights have vested.  In effect,
the rule prevents a zoning board of appeals from denying an
application for a variance when the need for the variance to

61

avoid an unconstitutional taking has previously been recognized.

It is not obvious that the rule referenced in <u>Haines</u> should apply with equal force to applications for extensions of special permits.  But even if the rule logically applies across the board, at the time the Commission acted, it was not clear that the rule entitled Handsome to an extension.

When Handsome applied for the special permit, it led the Commission to believe that the building would be constructed without delay.  On the basis of that understanding, the Commission granted the permit subject to conditions requiring the site to be prepared for the building within one year and the building to be constructed within the following year.  When Handsome applied for the extension five years later, no progress had been made on constructing the building.

As shown by the transcript of the hearing on the permit extension, the Commission members were concerned that Handsome was more interested in operating an excavation business than constructing the building.  Viewed objectively, their concern was well-founded in light of Handsome's failure to make progress on the permitted project and its failure to file progress reports as required by the conditions in the special permit. Mr. Cascella and Mr. Bjorklund could have requested an

opportunity to respond to the remarks of the Commission members to dispel this concern.  But neither of them spoke.  In the circumstances, an objective observer could think that Handsome's apparent use of the special permit to operate an excavation business rather than construct the building was a material change in the facts and circumstances affecting the Commission's decisionmaking.

I also conclude that the individual defendants who voted to deny the extension (Mr. Zini and Mr. Leneker) are entitled to qualified immunity as a matter of law.  Even if the decision in Haines could be interpreted to suggest that a special permit must be renewed in the absence of a material change in circumstances, Haines did not provide, with the clarity required for a substantive due process claim, that an extension must be granted to an applicant in Handsome's position.  As a result, a reasonable official could think that denying the extension was not unlawful.  Moreover, I do not think a reasonable jury could find that requiring Handsome to file a new application was arbitrary in the constitutional sense.[25]

---

25 Mr. Cascella's testimony that Handsome could not begin to construct the first building until the site had been prepared for all three potential buildings does not support a finding that the defendants' actions were outrageously arbitrary.  As far as the record shows, prior to Mr. Cascella's deposition, Handsome never informed the Commission that construction of the approved building would have to wait until the site was prepared for the

Accordingly, summary judgment will enter in favor of all the defendants on count one of the TAC.

### C.   First Amendment Claim

Count two of the TAC, the First Amendment retaliation claim, alleges as follows:

> The defendants' actions interfered with the plaintiffs['] [F]irst [A]mendment constitutional right of access to the courts . . . .  Specifically the defendants retaliated against the plaintiffs for exercising their constitutional right to appeal the commission's decision to deny renewal of the special permit in April of 2008 and for prevailing in that appeal.

> The retaliation of the plaintiffs [sic] took the form of purposely delaying for nearly eight months, compliance with the court order to renew the permit and, when it was finally force[d] to confront the fact of its noncompliance the commission added new and onerous conditions to renewal of the special permit designed to punish the plaintiffs for appealing the commission's April 2008 decision not to renew the special permit.

> The retaliation also took the form of a plan, developed at the executive session, to commence a zoning enforcement suit against all three of the plaintiffs when Handsome could not comply with the new and onerous conditions.  Said plan was subsequently implemented by the [T]own of Monroe when it commenced a zoning enforcement lawsuit entitled Joseph Chapman et al. Vs. Handsome, Inc., et al., FBT CV-11-6020905, only to unilaterally withdraw said action approximately eighteen months later.

ECF No. 159, Count Two, ¶¶ 49-50.

---

construction of all three buildings.

To prevail on this claim as to any of the individual defendants, plaintiffs must prove that the defendant was personally involved in at least one of the challenged actions (i.e. delaying action on the extension, granting the extension subject to new requirements and commencing and maintaining the zoning enforcement action).  In addition, they must prove that retaliatory animus arising from the first appeal was the but for cause of the individual's action, meaning the individual would not have engaged in the challenged action were it not for his or her retaliatory motive.  See Nieves v. Bartlett, 139 S. Ct. 1715, 1722 (2019).  Finally, plaintiffs must prove that the individual's retaliatory action caused Handsome economic harm.

I conclude that the evidence would not permit a jury to make these findings as to any of the defendants and that each of them is entitled to qualified immunity on the retaliation claim as a matter of law.

### a. Noerr-Pennington

Defendants contend that to the extent the retaliation claim is based on the zoning enforcement action, they are entitled to summary judgment under the Noerr-Pennington doctrine, which provides an immunity against liability for conduct protected by the right to petition.  See Miracle Mile Associates v. City of

Rochester, 617 F.2d 18, 20-21 (2d Cir. 1980).  Under this
doctrine, litigation cannot give rise to liability unless it is
a "sham," meaning both (1) objectively baseless and (2) used for
the purpose of causing harm.  See Mosdos Chofetz Chaim, Inc. v.
Village of Wesley Hills, 701 F. Supp. 2d 568, 602 (S.D.N.Y.
2010).  The Second Circuit has not decided whether Noerr-
Pennington immunity applies in actions under § 1983.  Id. at
595.  However, a majority of circuit courts have decided that it
does. Id. at 595-96 (collecting cases); see Martin A. Schwartz,
1A Section 1983 Litigation Claims and Defenses, § 9.09 at 9-311
(4th ed. 2023-1 Supp.) (federal courts "have consistently held
that Noerr-Pennington immunity applies to claims asserted under
§ 1983.").

    In Mosdos, Judge Karas analyzed the issue in depth.  He
concluded that "government actors are afforded some measure of
protection under the Noerr-Pennington doctrine and the First
Amendment [right] to petition when they lawfully [exercise that
right] (i.e. when they are in compliance with other applicable
constitutional provisions) in their representative capacity."
701 F. Supp. 2d at 601-02.  His reasoning is persuasive.  See
id. at 597 ("If first amendment petitioning could be challenged
in the section 1983 context as a denial of equal protection, or

a first amendment violation, or other constitutional claim, it would vitiate Noerr-Pennington protection.") (original quotation and brackets omitted).

Defendants contend that the zoning enforcement action was not a "sham."  I agree.  The Town had probable cause to bring the action based on, among other things, Handsome's resumption of work at the site without posting the restoration bond.  The parties dispute whether the withdrawal of the suit following the second zoning appeal permits an inference that it was filed for an improper purpose.  However, a defendant's subjective intent in filing a suit is irrelevant unless it is first determined that the suit was objectively baseless.  See Mosdos, 701 F. Supp. 2d at 602.

Because the zoning enforcement action was not objectively baseless, defendants are protected by Noerr-Pennington immunity against liability under § 1983 for filing and maintaining the action.  Therefore, the retaliatory actions at issue under count two are the delay in acting on the extension following the first zoning appeal and the imposition of the new requirements. Neither of these provides a basis for liability under this count.

67

b. Qualified Immunity

When the record discloses a non-retaliatory explanation for action by a government official, qualified immunity shields the official from liability unless the plaintiff points to "affirmative evidence from which a jury could find" that the official engaged in retaliation.  See Crawford-El v. Britton, 523 U.S. 574, 600 (1998) ("At [the summary judgment] stage, . . . plaintiff may not respond simply with general attacks upon the defendant's credibility . . . .").  In other words, plaintiffs "must proffer particularized evidence of direct or circumstantial facts . . . supporting the claim of improper motive in order to avoid summary judgment."  Blue v. Koren, 72 F.3d 1075, 1084 (2d Cir. 1995).

In this case, there is a non-retaliatory explanation for both the Commission's delay in acting on the extension following the appeal and the imposition of the new requirements: the Commission did not act on the extension until after the tax foreclosure proceeding was resolved; and the new requirements were consistent with the original conditions of approval. Accordingly, plaintiffs must present particularized evidence that a defendant acted with retaliatory motive.

In Blue, the Second Circuit identified the types of

68

evidence that may be relied on for this purpose: "expressions by the officials involved regarding their state of mind, circumstances suggesting in a substantial fashion that the plaintiff has been singled out, or the highly unusual nature of the actions taken."  Id.  After reviewing the record for evidence of this type, I find that each of the individual defendants is entitled to summary judgment based on qualified immunity.

There is no evidence of "expressions" by any of the individual defendants reflecting retaliatory animus against the plaintiffs because they took the appeal.  There is no evidence that any of the individual defendants treated an applicant for a permit extension more favorably in circumstances suggesting in a substantial fashion that plaintiffs were "singled out" for less favorable treatment because they took the appeal.  There is no evidence that any of the individual defendants took action of a "highly unusual" nature linked to the appeal.[26]

---

26 Plaintiffs complain about the following actions: the Commission did not give the Cascellas notice that it would discuss Handsome's property at the May 5, 2011 meeting, and when asked told them the property was on the agenda only for informational purposes, ECF No. 182 at 37; at the May 5, 2011 meeting, the Commission entered an illegal executive session, id.; the cease and desist order was issued before a 30-day grace period expired, id. at 37-38; a copy of the order was not sent to Handsome's attorney, although other orders had been shared with the attorney, id.; and the zoning enforcement action was filed against Handsome and the Cascellas personally, id. at 38. These actions, viewed collectively, were not of such a highly unusual nature as to support a reasonable inference of retaliatory intent.

In some instances, temporal proximity between a plaintiff's protected activity and a defendant's adverse action may permit an inference that the adverse action was prompted by a retaliatory motive.  Here, the first appeal preceded the alleged adverse actions by thirty months.  Such a lengthy gap typically makes it very difficult for a retaliation claim to succeed.[27]

On this record, a jury could not reasonably find that any of the individual defendants acted with the retaliatory motive alleged in count two of the TAC.

In addition, plaintiffs lack sufficient evidence to permit a reasonable finding that retaliatory animus was the but for cause of the challenged actions.  More specifically, the evidence is insufficient to prove as to any of the defendants

---

[27] Even after such a long delay, evidence that the defendant took retaliatory action at its first opportunity can defeat summary judgment.  Bucalo v. Shelter Is. Union Free Sch. Dist., 691 F.3d 119, 131 (2d Cir. 2012) (retaliation claim submitted to jury despite four-year gap of time).  But an inference of causation may be unreasonable if adverse action preceded the protected activity.  Musco Propane, LLP v. Town of Wolcott Planning & Zoning Com'n, 536 F. App'x 35, 39-40 (2d Cir. 2013) (summary order).  In this case, the appeal was preceded by the denial of the extension.  A pattern of repeated adverse actions may also serve as circumstantial evidence of retaliation, even in the absence of a strong temporal connection.  Gagliardi v. Vill. of Pawling, 18 F.3d 188, 195 (2d Cir. 1994) (allegations that defendant repeatedly refused plaintiffs' requests to enforce zoning codes and ordinances over period of nine years sufficient to support plausible claim of retaliatory motive).  Here, the initial application for the 125 Garder Road project was granted in 2003, the extension was denied in 2008, and new requirements were added in 2011.  This series of events is not comparable to the situation alleged in Gagliardi.  Plaintiffs also point to the denial of Handsome's 32-unit affordable housing application in 2008.  But Handsome's appeal of the denial led to a settlement on terms favorable to Handsome within one year of the denial.

that were it not for retaliatory animus prompted by the appeal, the defendant would have placed the extension on the agenda sooner and voted to grant the extension without new requirements.

Finally, the evidence is insufficient to support a finding that the challenged actions caused economic harm to Handsome. Plaintiffs' claim for compensatory damages is predicated on the denial of the permit extension in 2008, as shown by the following passage in one of Mr. Cascella's affidavits:

> As a result of the refusal of the Monroe zoning commission to renew the special permit/site plan for 125 Garder Road in 2008, Handsome, me and my other companies have lost a tremendous amount of business since that time and all of the business loans are now in default, the mortgages are in foreclosure and I and my wife are personally liable to Handsome's creditors to the tune of several million dollars all of which has caused us great mental and emotional anguish and stress and personal humiliation.

ECF No. 105-1, ¶ 14.

Crediting Mr. Cascella's testimony, the harm he describes occurred before the retaliatory actions alleged in count two (i.e. the delay in complying with the court's order and the imposition of the new conditions and the zoning enforcement action).

### c. Denial of Permit Extension

As mentioned earlier, plaintiffs' supplemental brief argues

71

that the First Amendment claim in count two extends back in time
to the denial of the permit extension in 2008 following the
filing of the affordable housing application.  Count one of the
TAC alleges that hostility generated by the affordable housing
application tainted the denial of the extension, rendering the
denial a violation of substantive due process.  In effect, then,
plaintiffs are seeking to rely on those same allegations to
support the First Amendment retaliation claim in count two.  In
view of defendants' objection, I have considered whether
plaintiffs should be allowed to oppose summary judgment based on
this new theory of liability.  I conclude that this should not
be allowed.

Plaintiffs' attempt to rely on the denial of the extension
to support the First Amendment claim is barred by the statute of
limitations.  Any retaliation claim based on the denial of the
extension accrued in April 2008, when the extension was denied.
Plaintiffs brought this suit in May 2011, more than three years
later.  No retaliation claim was made at that time.  The
retaliation claim in count two was not added until February
2012.

Even if the statute of limitations did not apply,
plaintiffs have waived their new theory of liability by failing

to raise it in a timely manner.[28]  Plaintiffs could have raised

this theory of liability when they sought leave to amend after

defendants moved to dismiss the complaint for failure to state a

claim.  In seeking leave to add the retaliation claim,

plaintiffs made it clear that the claim would be based on the

appeal, and the amendment was permitted on that basis.  At no

time prior to filing their supplemental brief on the renewed

motion for summary judgment did plaintiffs provide any

indication that the claim was based on anything other than the

appeal.

Permitting plaintiffs to change the theory of the claim at

this juncture would be prejudicial.  In its present form, count

two "[s]pecifically" identifies the protected activity as the

plaintiffs' exercise of their right to "access . . . the courts"

by appealing the denial of the permit extension.  ECF No. 159 ¶

49.  In addition, it enumerates the retaliatory actions as the

---

28 After a motion for summary judgment has been filed, it is usually too late
for a plaintiff to raise a new theory of liability.  But if the new theory
was forecast by the original allegations, the court has discretion to allow
the claim in the absence of prejudice to the defendant.  See Miller v.
Selsky, 234 F.3d 1262 (2d Cir. 2000) (prisoner's motion for leave to amend to
add claims of retaliation and conspiracy and add facts relating to incident
that occurred two months before disciplinary hearings at issue should have
been granted; new facts were merely variations on the original theme that
prisoner's rights were violated when he was subjected to punishment as a
result of disciplinary hearings; new facts did not raise wholly new claims;
and since no discovery had occurred there was no prejudice if amended
complaint required discovery); Brown v. City of New York, 862 F.3d 182, 187
(2d Cir. 2017); Cadoret v. Sikorsky Aircraft Corp., 323 F. Supp. 3d 319, 326
n.7 (D. Conn. 2018).

Commission's unreasonable delay in acting on the extension following the appeal, the imposition of new requirements on the extension and the commencement of the zoning enforcement action. Given the specificity with which the claim is pleaded, defendants had no reason to think the occurrences underlying the claim extended back in time to the denial of the extension.

In reaching this conclusion, I have considered whether a retaliation claim based on the extension denial would survive summary judgement if it were not time-barred.  To prevail on this claim, plaintiffs would have to prove that but for retaliatory animus arising from the filing of the affordable housing application, the extension would have been granted.  The evidence is insufficient to permit such a finding.

Plaintiffs' allegation that the affordable housing application generated retaliatory animus against Handsome is not well-supported.  There is no evidence that any member of the Commission displayed hostility to the affordable housing application.  At a hearing on the application in June 2008, Handsome's attorney at the time, Mr. Ranelli, thanked the Commission for its patience and said that, "with maybe some very minor exceptions," he thought "everyone" had done a "commendable job of trying to stick to the issues . . . and not look beyond

74

that to other issues." ECF No. 186 at 2, n.3 (citing ECF No. 182-2 at 195-96). Mr. Ranelli paid that compliment to the Commission after the application for the permit extension had been denied.

There is no evidence that the individual defendants who voted to deny the extension (Mr. Zini and Mr. Leneker) were motivated by retaliatory animus arising from the affordable housing application. Plaintiffs point to Mr. Zini's remarks during the hearing on the extension. ECF No. 182 at 7. But his remarks reflect no animus against Handsome. The transcript shows that he was primarily concerned about laxity in the enforcement of zoning regulations in the Town. Mr. Leneker voiced similar concerns while expressing empathy for developers generally. There is no evidence that either Mr. Zini or Mr. Leneker singled out Handsome in any respect, or did anything of a highly unusual nature with regard to Handsome. On this record, I do not think a jury could reasonably find that either Mr. Zini or Mr. Leneker acted with retaliatory animus stemming from the filing of the affordable housing application.

Nor do I think the evidence would permit a jury to reasonably find that such retaliatory animus was the but for cause of the defendants' actions. It is apparent that Mr. Zini

and Mr. Leneker would have voted against the extension in any case because they thought it was necessary for the Commission and other officials in Monroe to be more diligent in enforcing special permit conditions.  Accordingly, judgment will enter in favor of all the defendants on count two of the TAC.

### D.  Equal Protection Claim

Count three of the TAC alleges that the defendants intentionally discriminated against Handsome in violation of the Equal Protection Clause of the Fourteenth Amendment, which requires that government treat similarly situated people alike. Harlen Assocs. v. Inc. Village of Mineola, 273 F.3d 494, 499 (2d Cir. 2001).  Plaintiffs allege that the Town treated them differently than Monroe Land Holdings ("MLH"), which owned a 74-acre parcel of land in the same industrial district ("64 Cambridge Drive").  In March 2006, MLH obtained a special exception permit from the Commission for the construction of two industrial buildings and associated site improvements at 64 Cambridge Drive.[29]  Prior to that time, it had obtained an excavation special permit from the ZBA enabling it to excavate the site at a rate of ten acres at a time.  The ZBA's approval had an expiration date of November 1, 2011.  The special

---

29 See ECF No. 170-48 (MLH's special exception permit).

exception permit granted by the Commission expressly incorporated the conditions of approval in the special excavation permit granted by the ZBA.

Plaintiffs' claim is based on differential treatment of the two entities between the date MLH's special exception permit expired (March 21, 2011) and the date the Commission granted the 125 Garder Road permit extension with new requirements (May 5, 2011). Specifically, plaintiffs allege that notwithstanding alleged regulatory violations at the MLH site and expiration of its special exception permit (with only half the excavation completed), the Commission did not issue a cease-and-desist order against MLH or require it to post a restoration bond, as it did in the case of Handsome. As plaintiffs put it, the defendants allowed MLH to operate a rock mining operation with no zoning oversight, yet cracked down on Handsome.

Plaintiffs' claim is a "class of one" equal protection claim. In Village of Willowbrook v. Olech, 528 U.S. 562 (2000) (per curiam), the Supreme Court decided that such a claim is available when a plaintiff has been "intentionally treated differently from others similarly situated" and "there is no rational basis for the difference in treatment." Id. at 564. In Olech, the defendant village refused to connect the

plaintiff's home to a water main unless she granted the village
a 33-foot easement instead of the customary 15-foot easement
required of other property owners.

In Engquist v. Oregon Dept. of Agriculture, 553 U.S. 591
(2008), the plaintiff brought a class of one claim challenging
the termination of her government employment and obtained a
substantial jury verdict.  The Court ruled that government
employees cannot rely on a class of one claim to challenge a
personnel decision.  The Court observed that "[w]hat seems to
have been significant in Olech and the cases on which it relied
was the existence of a clear standard against which departures,
even for a single plaintiff, could be readily assessed."  Id. at
602.  In Olech, the clear standard was the requirement of a 15-
foot easement from property owners seeking to connect to the
water main.  There was no similar standard for assessing the
personnel decision in Engquist.  Accordingly, the jury verdict
had to be overturned.

The Second Circuit has held that Olech requires an
"extremely high degree of similarity" between a plaintiff and a
comparator. See Hu v. City of New York, 927 F.3d 81, 93 (2d Cir.
2019); Clubside, Inc. v. Valentin, 468 F.3d 144, 159 (2d Cir.
2006).  The circumstances of the plaintiff and the comparator

must be "effectively identical."  Pappas v. Town of Enfield, 18
F. Supp. 3d 164, 180 (D. Conn. 2014), aff'd, 602 F. App'x 35 (2d
Cir. 2015).  To satisfy this test, a plaintiff must prove that:
"(1) no rational person could regard the circumstances of the
plaintiff to differ from those of a comparator to a degree that
would justify the differential treatment on the basis of a
legitimate government policy; and (2) the similarity in
circumstances and difference in treatment are sufficient to
exclude the possibility that the defendant acted on the basis of
a mistake."  Neilson v. D'Angelis, 409 F.3d 100, 105 (2d Cir.
2005), rev'd on other grounds by Appel v. Spiridon, 531 F.3d 138
(2d Cir. 2008).  Summary judgment is appropriate if "no
reasonable jury could find that the persons to whom the
plaintiff compares itself are similarly situated."  Clubside,
Inc., 468 F.3d at 159.

Defendants argue that Handsome and MLH were not similarly
situated for a variety of reasons, including the significant
difference in the size of their respective sites; differences in
their applications; differences in the conditions in the permits
they received in 2003 and 2006, respectively; and differences in
their records of compliance with regulatory requirements.  In
addition, defendants point to changes in the membership of the

Commission between 2006, when MLH's special permit was granted, and 2011, when Handsome's extension was granted subject to new requirements; and changes in the Commission's practice regarding restoration bonds between 2006 and 2011.

I conclude that with regard to the differential treatment at issue (i.e. requiring Handsome to post the restoration bond and issuing the cease-and-desist order) Handsome was not similarly situated to MLH as a matter of law.[30]

The differential treatment must be assessed in context. Handsome applied for permission to prepare a site for construction of an industrial building and submitted a building plan that was "construction ready."  ECF No. 170-2 ¶ 84. Handsome's plan of development for its 10-acre site allowed for a total of three potential buildings.  But it sought approval for just one building to avoid permitting delays.  The Commission understood that excavation would be necessary to lower the elevation of the portion of the site where the building would be constructed.  But it was not informed that

---

30 The defendants point to other bonds imposed on other MLH properties as evidence that MLH and Handsome were not treated differently with respect to the restoration bond, ECF No. 170-55, but I find this evidence unconvincing. Different types of bonds on different properties owned by MLH can establish that the Commission often imposed bonds, including on MLH, but it does not establish that the two relevant comparator properties were treated the same way with respect to this specific type of bond.

construction of the building would have to wait until the entire site had been excavated for three buildings.

MLH, in contrast, sought permission from the Commission to construct two industrial buildings at its much larger site, having already obtained permission from the ZBA to excavate the site ten acres at a time.  The plan MLH submitted to the Commission was "conceptual" and "designed to be supplemented with a new plan in the future."  ECF No. 170-1 at 40. Plaintiffs argue that Handsome's plan was also conceptual and designed to be supplemented.  But the fact remains that Handsome applied for a permit for one building and made it appear that excavation of the site would be incidental to that use.  MLH made no similar representations.

Handsome and MLH also differed significantly with regard to their compliance with reporting requirements.  At the hearing on the application for the extension, Mr. Zini stated that Handsome and Mr. Tuba seemed to be playing "cat and mouse."  ECF No. 170-11 at 6.  That view was based in part on Handsome's failure to file progress reports as required by the original permit except when forced to do so.[31]  During the five-year term of the

---

[31] As mentioned earlier, the original permit required Handsome to provide a progress report from a supervising design engineer every 60 days until the completion of grading activities at the site, detailing the status of excavation, contour levels, amount of materials removed, and any conditions

original permit, Handsome provided only five out of a total of
30 required reports.  Mr. Tuba informed the Commission that
Handsome would submit reports when told to do so in order to
avoid being shut down.  Furthermore, the reports it did submit
"lacked 'fundamental information' [citing Defs.' Loc. R.
56(a)(1) Stmt., ECF No. 170-2, ¶ 94], were undated, did not
state who prepared them, and were not certified by an engineer."
ECF No. 170-1 at 42. In contrast with Handsome's record of
noncompliance, MLH's record was one of consistently filing
detailed progress reports.[32]

Moreover, at the time of the differential treatment at
issue, Handsome's circumstances and MLH's circumstances were not
effectively identical.  The Commission was required to act on
Handsome's application for an extension but it had no pending
application from MLH.  The Commission was authorized to require
Handsome to post a bond as a condition of the extension.  The
need for a restoration bond was heightened in Handsome's case
due to its financial difficulties.  Plaintiffs have not shown
that MLH faced similar difficulties.  The cease-and-desist order

---

requiring mitigation or other corrective action.
32 Plaintiffs state that MLH's reports revealed violations of its permit
conditions, including run off into nearby wetlands.  Assuming plaintiffs'
statement is accurate, MLH's disclosure of the alleged violations further
distinguishes it from Handsome with regard to complying with reporting
requirements.

was issued to Handsome after it resumed work at the site without posting the bond.  The order specifically notified Handsome of its right to appeal to the ZBA.  The zoning enforcement action was brought to enforce the cease-and-desist order after Handsome failed to appeal.  MLH did not engage in similar conduct.

Handsome did not have a right to conduct a rock mining operation at 125 Garder Road in violation of regulatory requirements.  That MLH was not ordered to cease its rock mining operation does not support a reasonable inference that the enforcement action against Handsome lacked a legitimate basis. Indeed, at the time the Commission acted on Handsome's extension, MLH's excavation special permit was still in effect. Accordingly, plaintiffs' class of one claim is unavailing.

I also conclude that each of the individual defendants is entitled to summary judgment with regard to this claim based on qualified immunity.  In the circumstances, it would not have been clear to a reasonable official that requiring Handsome to post a restoration bond and issuing the cease-and-desist order would violate Handsome's right to equal protection.

### IV. Conclusion

Accordingly, the renewed motion for summary judgment is hereby granted.

The Clerk may enter judgment in favor of all defendants on all three counts in the TAC.

So ordered this 31st day of March 2023.


```
_____/s/ RNC_____
       Robert N. Chatigny
  United States District Judge
```